IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIRST NATIONAL BANK OF ARIZONA, )<br>　　　　　　　　　　　Plaintiff, )<br>　　　v. )<br>　　　　　　　　　　　　　　　　　 )<br>BELL CAPITAL, INC., )<br>SUE RADO a/k/a SUZANNE RADO )<br>a/k/a SUZANA RADOJCIC )<br>BUDIMIR RADOJCIC, )<br>LOUIS L. JAVELL, )<br>ACQUEST TITLE SERVICES, LLC, )<br>EUGENIUSZ DOMINIKOWSKI a/k/a )<br>E. DOMINKOWSKI, )<br>LAWYERS TITLE INSURANCE )<br>CORPORATION, )<br>JUAN OROZCO )<br>　　　　　　　　　Defendants. ) | Case No.  07 C 4581<br><br><br>Jury Trial Demanded |

**THIRD AMENDED COMPLAINT**

NOW COMES Plaintiff FIRST NATIONAL BANK OF ARIZONA ("FNBA"), by and through its attorneys, Craig C. Smith and Michael J. Weik of Smith & Weik, LLC, and complains of the Defendants as follows:

## Jurisdiction and Venue

1. This Court has jurisdiction by virtue of diversity of citizenship. The citizenship of Plaintiff is diverse from the citizenship of each of the Defendants. The amount in controversy exceeds $75,000.00.

2. Venue is proper pursuant to 28 U.S.C. § 1391(a) as the acts and transactions that give rise to this action occurred, in substantial part, in this district.

## Parties

1

3. Plaintiff is a national banking association chartered under 12 U.S.C. § 24, with the State of Arizona designated as its main office in its articles of association and therefore, is a citizen of the State of Arizona.

4. Defendant Bell Capital, Inc., is an Illinois Corporation with its principal place of business in Chicago. Bell Capital, Inc., is engaged in the business of brokering mortgages in Illinois.

5. Defendant Sue Rado a/k/a Suzanne Rado a/k/a Suzana Radojcic ("Suzana") an individual and a citizen of the State of Illinois. Suzana was at all relevant times herein an employee of Bell Capital. Suzana is the Daughter of Budimir Radojcic.

6. Defendant Budimir Radojcic is an individual and a citizen of the State of Indiana. Mr. Radojcic is the father of Suzana.

7. Defendant Louis L. Javell is an individual and a citizen of the State of Illinois. Mr. Javell is the nephew of Budimir Radojcic and was at all relevant times, the President and sole shareholder of Bell Capital, Inc.

8. Defendant Acquest Title Services, LLC, is an Illinois limited liability company. The members of Acquest Title Services, LLC are John B. Burgeson and Noreen T. Burgeson, who are individuals and citizens of the State of Illinois.

9. Defendant Eugeniusz Dominikowski a/k/a E. Dominkowski ("Dominikowski") is an individual and a citizen of the State of Illinois.

10. Defendant Lawyers Title Insurance Corporation is a Virginia Corporation with its principal place of business in Virginia.

11. Defendant Juan Orozco is an individual and a citizen of the State of Illinois.

## COUNT I
### *Breach of Contract v. Bell Capital, Inc.*

12. Plaintiff incorporates Paragraphs 1-11 above as its allegations in Paragraph 12.

13. On or about December 14, 2001 First National Bank of Arizona and Bell Capital, Inc. ("Bell" or "Bell Capital"), entered into a Broker Agreement ("Agreement"), whereby FNBA agreed to originate mortgage loans packaged and submitted by Bell to FNBA for underwriting and funding. A true and correct copy of the Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

14. The Agreement provides in pertinent part:

> This Agreement is intended to set forth the entire understanding between the parties whereby Lender agrees to originate mortgage loans processed and/or packaged by Broker to Lender for processing and/or underwriting approval and funding from time to time under programs offered by Lender.
>
> * * *
>
> b) All documents submitted by the Broker in connection with application presented to Lender are in every respect valid and genuine. All information (credit and otherwise) submitted in connection with a loan application is accurate and complete and no information has been submitted which is false or misleading in any respect. The term information shall mean any and all information and documentation obtained from the applicant and any reference source, which should have, (according to the standard practices and procedures in the mortgage industry), been within the control or knowledge of the Broker;
>
> c) In the event that the Broker submits to Lender; any false or misleading information in connection with any loan, and the Broker knew or in the exercise of reasonable diligence should have known of its false, fraudulent or misleading nature, Lender shall have the right to rescind its purchases of such a loan or require Broker to reimburse Lender for all expenses, losses, and damages in connection with the repurchased loan. Upon notification of this, Broker shall immediately restore to Lender, the purchase price originally paid, with adjustments for principal payments made, plus any related losses or damages, any costs, expenses or losses incurred by Lender in connection with the loan. Upon receipt of such payment, Lender will convey to the Broker, the loan or real property security.

    d)  All real estate appraisals provided in connection with any loan application will be performed by an appraiser from an approved appraisal list provided by Lender.  All appraisals will meet USPAP standards.

15.    Pursuant to the Agreement, on or about August 2002, Bell submitted a mortgage loan application package on behalf of Martha Smylie (the "Smylie Loan Package") for approval by FNBA.

16.    Bell represented to FNBA that the Smylie Loan Package was for a mortgage loan to finance the purchase of an owner occupied, condominium residence located at 4628 S. Calumet Ave., Unit 105, Chicago, IL ("Unit 105").

17.    As part of the Smylie Loan Package, Bell submitted to FNBA the following documents:

    A.    An occupancy affidavit signed by Martha Smylie representing that Martha Smylie would occupy Unit 105 as her primary residence.

    B.    A loan application signed by Martha Smylie representing that Unit 105 would be her primary residence.

    C.    A homeowners insurance policy representing that the insured owner of the property was Martha Smylie.

    D.    A Homeowners Association Certification representing, among other things: (1)  that the control of the Homeowners Association was transferred from the developer to the unit owners on October 15, 2000; (2) that all seven of the units in the project were sold and closed;  and (3) that there were no multiple sales to any one investor.

    E.    An appraisal of Unit 105, purportedly signed by Anthony L. Mitchell valuing Unit 105 at $250,000.00 (the "Mitchell Appraisal").

18. In fact, the foregoing documents Bell submitted to FNBA as part of the Smylie Loan Package were not valid and genuine in that:

    A. Anthony L. Mitchell never appraised Unit 105.

    B. Anthony L. Mitchell never signed the Mitchell Appraisal.

    C. The Homeowners Insurance Policy was never issued to Martha Smylie.

19. Furthermore, the foregoing information Bell Capital submitted to FNBA as part of the Smylie Loan Package was false, fraudulent and/or misleading in that:

    A. Martha Smylie never occupied Unit 105 as her primary residence.

    B. Martha Smylie never intended to occupy Unit 105 as her primary residence.

    C. The control of the Homeowners Association was not transferred from the developer to the unit owners on October 15, 2000; (2) all seven of the units in the project were not sold and closed; and (3) there were multiple sales of condominium units to a single investor.

20. The Mitchell Appraisal did not meet USPAP standards.

21. Bell Capital knew or in the exercise of reasonable diligence should have known of the false, fraudulent or misleading nature of the information and documents set forth in Paragraphs 15 and 16 above.

22. FNBA approved Smylie's loan application and prepared certain documents for the closing.

23. Acquest acted as FNBA's settlement agent for the Smylie Loan and provided settlement services for FNBA in connection with the Smylie Loan.

24. On August 15, 2002, FNBA loaned Martha Smylie $200,000.00 to fund her purchase of Unit 105 ("Smylie Loan").

25. Acquest distributed the proceeds of the Smylie Loan.

26. The false information Bell submitted to FNBA as part of the Smylie Loan Package constitutes a breach of the representations and warranties Bell made to FNBA in the Agreement.

27. The invalid and counterfeit documents Bell submitted to FNBA as part of the Smylie Loan Package constitute a breach of the representations and warranties Bell made to FNBA in the Agreement.

28. The failure of the Mitchell Appraisal to meet USPAP standards constitutes a breach of the representations and warranties Bell made to FNBA in the Agreement.

29. FNBA has notified Bell of Bell's breach and has demanded that Bell restore the purchase price of the loan and any damages in accordance with the Agreement.

30. Despite such demand, Bell has failed and/or refused to pay FNBA's damages.

31. As a result of Bell's breach, FNBA has sustained injury in an amount in excess of $75,000.00.

32. FNBA has been required to expend attorney's fees to enforce the terms of the Agreement.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Bell Capital, Inc., award Plaintiff its reasonable attorney's fees and costs of litigation and for such other relief, as this Court deems just and equitable.

## COUNT II
*Intentional Misrepresentation v. Sue Rado a/k/a Suzanne Rado a/k/a Suzana Radojcic*

33. Plaintiff incorporates the allegations contained in Paragraphs 1-32 above as its allegations in Paragraph 33.

34. Suzana made false representations of material fact to FNBA as follows:

    A. Submitting an appraisal to FNBA with the Smylie Loan package that was not valid and genuine.

    B. Submitting a homeowners insurance policy to FNBA that was not valid and genuine.

    C. Submitting a Homeowners Association Certification to FNBA that contained false information.

35. Suzana made the above representations to FNBA knowing that they were false.

36. Suzana intended that FNBA rely on the misrepresentations so as to induce FNBA to approve and fund the Smylie Loan.

37. In reliance on the documents and submissions Suzana made in connection with the Smylie Loan Package, FNBA approved and funded the Smylie Loan.

38. FNBA would not have funded the Smylie Loan but for Suzana's misrepresentations as set forth above.

39. As a direct result of the misrepresentations made by Suzana, FNBA has suffered a loss in excess of $75,000.00.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Sue Rado a/k/a Suzanne Rado a/k/a Suzana Radojcic and for such other relief, as this Court deems just and equitable.

## COUNT III
*Intentional Misrepresentation v. Bell Capital, Inc.*

40. Plaintiff incorporates the allegations contained in Paragraphs 1-39 above as its allegations in Paragraph 40.

41. At all relevant times herein, Suzana was an employee or agent of Bell Capital, Inc., and was acting within the scope of her employment during the time she made intentional misrepresentations to FNBA to induce FNBA to approve and fund the Smylie Loan.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Bell Capital, Inc., and for such other relief, as this Court deems just and equitable.

## COUNT IV
*Civil Conspiracy v. Budimir Radojcic, Bell Capital, Inc., Sue Rado a/k/a Suzanne Rado a/k/a Suzana Radojcic, and Louis Javell.*

42. Plaintiff incorporates the allegations contained in Paragraphs 1-41 above as its allegations in Paragraph 42.

43. In or about March 1999, Budimir Radojcic ("Radojcic") acquired certain real property commonly known as 4626-28 S. Calumet Ave., Chicago, IL 60653 (the "Calumet Property") for $70,000.00 cash.

44. Radojcic subsequently transferred title to the Calumet Property to Cole Taylor Bank as Trustee of Trust No. 99-8830.

45. At all relevant times herein, Radojcic had the sole power of direction for Cole Taylor Bank Trust No. 99-8830.

46. In or about February 2002, Radojcic had prepared and executed a Declaration of Condominium Ownership for the Calumet Property.

8

47. Radojcic signed a Certificate of Compliance attached to the Declaration of Condominium certifying that he was the developer of the Calumet Property.

48. The Calumet Property was purportedly converted into 7 individual condominium units, each with its own Permanent Index Number, known as Units 101-107 (the "Units").

49. Radojcic advertised the Units for sale.

50. Martha Smylie agreed to purchase Unit 105 in the Calumet Property.

51. Radojcic referred Smylie to Suzana at Bell Capital, Inc., to initiate the loan application process for the purpose of obtaining financing to purchase Unit 105.

52. At all relevant times herein, Suzana was an employee of Bell Capital, Inc.

53. Bell Capital, Inc., had contacts at various mortgage lenders around the country to which it could submit mortgage loan applications for funding.

54. Louis L. Javell ("Javell") agreed with Radojcic to allow Javell's company, Bell Capital Inc., to be used to broker a mortgage loan to enable Ms. Smylie to purchase Unit 105.

55. Suzana agreed with Javell and Radojcic to act as the loan officer for Ms. Smylie.

56. Radojcic, Suzana and Javell agreed that they would submit false loan application information, including a counterfeit appraisal, a counterfeit homeowners insurance policy and a false Homeowners Association Certification as part of the Smylie Loan Package to induce FNBA to approve the Smylie Loan so that Martha Smylie would purchase the Smylie Property at an artificially high price.

57. Suzana, acting as a loan officer in the course of her employment with Bell, submitted the Smylie Loan Package to FNBA containing, among other misrepresentations, a counterfeit appraisal, a counterfeit Homeowners insurance policy, a false Homeowners

Association Certification, a false occupancy affidavit and a loan application with false information.

58.　　Suzana submitted the counterfeit documents and false information to FNBA knowing they were false.

59.　　Suzana intended that FNBA rely on the misrepresentations and counterfeit documents so as to induce FNBA to approve and fund the Smylie Loan.

60.　　Suzana selected Acquest Title, LLC ("Acquest") to be the title insurance agent and escrow closing agent for the closing of the sale of Unit 105 and the concurrent funding of the Smylie Loan.

61.　　The closing was scheduled for August 15, 2002.

62.　　Acquest acted as the title insurance agent and escrow/closing agent for FNBA in connection with the closing of the Smylie Loan.

63.　　On or about August 15, 2002, Cole Taylor Bank as Trustee, acting at the direction of Radojcic, sold Unit 105 to Martha Smylie for $250,000.00.

64.　　Radojcic sold the Units in the Calumet Property as follows:

| Unit 101 | September 19, 2002 | $215,000.00 |
| Unit 102 | November 20, 2002 | $215,000.00 |
| Unit 103 | August 12, 2002 | $250,000.00 |
| Unit 104 | August 12, 2002 | $180,000.00 |
| Unit 105 | August 12, 2002 | $250,000.00 |
| Unit 106 | August 12, 2002 | $250,000.00 |
| Unit 107 | August 12, 2002 | at least $204,000.00 |

65.　　Radojcic sold the seven Calumet Property Units for at least $1,564,000.

66.　　On August 15, 2002, FNBA funded the Smylie Loan in the amount of $200,000.00 and made other payments in connection with the Smylie Loan including broker fees to Bell Capital, Inc., some of which were ultimately paid to Suzana.

10

67. Acquest distributed the proceeds of the Smylie Loan as follows:

   A.   $166,657.00   to Budimir Radojcic
   B.   $42,000.00    to E. Dominkowski
   C.   $10,795.00    to Bell Capital, Inc.
   D.   $3,686.00     to Acquest Title Services, LLC
   E.   $72.86        to Martha Smylie

68. Martha Smylie never occupied Unit 105.

69. Within several months after its origination, the Smylie Loan went into default.

70. FNBA would not have funded the Smylie Loan but for the misrepresentations and counterfeit documents submitted with the Smylie Loan Package as set forth above.

71. As a direct and proximate result of the Defendants' conspiracy to defraud FNBA, FNBA has suffered a loss in excess of $75,000.00.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Bell Capital, Inc., Sue Rado a/k/a Suzanne Rado a/k/a Suzana Radojcic, Louis Javell, Budimir Radojcic, and for such other relief as this Court deems just and equitable.

## COUNT V
*Breach of Contract v. Acquest Title Services, LLC*

72. Plaintiff incorporates the allegations contained in Paragraphs 1-32 above as its allegations in Paragraph 72.

73. Suzana selected Acquest Title, LLC ("Acquest") to be the title insurance agent and escrow closing agent for the closing of the sale of Unit 105 and the concurrent funding of the Smylie Loan.

74. The closing was scheduled for August 15, 2002.

75. Prior to the closing of the Smylie Loan, FNBA provided Acquest with certain written settlement instructions ("Settlement Instructions") to be followed in connection with the

11

closing of the Smylie Loan. A copy of the Settlement Instructions is attached hereto as Exhibit B.

76. Acquest agreed to perform the closing of the Smylie Loan in accordance with the Settlement Instructions.

77. The Settlement Instructions required Acquest to, among other things:

    A. send the Trustee's Deed from Cole Taylor Bank, as Trustee to Martha Smylie ("Trustee's Deed") to the County Recorder's Office for recording;

    B. send the Smylie Mortgage to the County Recorder's Office for recording; and

    C. place FNBA in a valid first lien position at the conclusion of the closing.

78. Acquest acted as the title insurance agent and escrow/closing agent for FNBA in connection with the closing of the Smylie Loan.

79. Acquest was paid at least $285.00 to act as Settlement agent for the Smylie Loan closing.

80. After the closing, Acquest returned the executed closing documents to FNBA with a certification executed by an agent of Acquest stating among other things, "…that the Conveyance Deed, Deed of Trust/Mortgage and any other documents required to be recorded have been sent to the appropriate County…." See Settlement Company Certifications as part of the Settlement Instructions attached hereto as Exhibit B.

81. After the closing, Acquest issued to FNBA several letters commonly referred to as "first lien letters" representing to FNBA that its mortgage was a first lien on Unit 105.

82.     In fact, Acquest failed to perform the Smylie Loan closing in accordance with the Settlement Instructions by, among other things, failing to timely send the Trustee's Deed and the Smylie Mortgage to the County Recorder.

83.     In or about February 2004, Martha Smylie conveyed Unit 105 to Rita Hammonds ("Hammonds") for $215,000.00.

84.     In order to fund her purchase of Unit 105, Hammonds borrowed $204,250.00 from Encore Credit Corp (the "Hammonds Loan").

85.     On February 27, 2004 Acquest Title Services, LLC acted as the settlement agent for the closing of the sale of Unit 105 from Smylie to Hammonds and the concurrent funding of the Hammonds Loan (the "Hammonds Closing").

86.     Subsequent to the Hammonds Closing, Acquest eventually caused the following documents to be recorded with the Cook County Recorder of Deeds:

| Doc No. | Recording Date | Doc Type | Description |
| --- | --- | --- | --- |
| 0407239021 | March 12, 2004 | Deed | Cole Taylor Trust # 99-8380 to Martha Smylie |
| 0407239022 | March 12, 2004 | Mortgage | Smylie to MERS (as Nominee for FNBA) |
| 0407239023 | March 12, 2004 | Deed | Smylie to Hammonds |
| 0407239024 | March 12, 2004 | Mortgage | Hammonds to Encore |

87.     Because Acquest did not record the Trustee's Deed and the Smylie Mortgage until after the Hammonds Closing, the Smylie Mortgage was not of record and Acquest paid the proceeds from the Smylie-Hammonds transaction to Smylie instead of paying off FNBA's mortgage.

13

88. As a result of Acquest's breach of the Settlement Instructions, FNBA has suffered damages in excess of $75,000.00.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Acquest Title Services, LLC and for such other relief, as this Court deems just and equitable.

## COUNT VI
*Fraud v. Juan Orozco and Acquest Title Services, LLC*

89. Plaintiff incorporates the allegations contained in Paragraphs 1-32 and 72 to 88 above as its allegations in Paragraph 89.

90. At all times relevant herein, Juan Orozco was an employee or agent of Acquest and was acting within the scope of his employment when he made intentional misrepresentations to FNBA to induce FNBA to approve and fund the Smylie Loan.

91. Juan Orozco conducted the closing of the Smylie Loan on behalf of Acquest.

92. Orozco certified to FNBA that it had sent the Trustee's Deed and FNBA Mortgage to the county recorder's office for recording.

93. At the time Orozco made the statements to FNBA in Paragraph 92 above, Orozco knew they were false.

94. Orozco further concealed his false statements to FNBA by issuing first lien letters to FNBA representing that FNBA's Mortgage was a valid first lien on Unit 105.

95. Subsequently, representatives of FNBA made inquiries of Acquest as to the whereabouts of the recorded Smylie Mortgage, but Acquest failed or refused to provide information as to the whereabouts of the recorded Smylie Mortgage.

14

96. Orozco intended that FNBA rely on the misrepresentations so as to induce FNBA to believe that it had a first-lien-mortgage on Unit 105.

97. In reliance on the statements Orozco made to FNBA, FNBA believed that it had a first lien position on Unit 105.

98. FNBA would not have believed that it had a first lien position on Unit 105 but for Orozco's misrepresentations and concealments as set forth above.

99. As a direct result of the misrepresentations and concealments made by Orozco FNBA was not in a first lien position at the time the Property was conveyed to Hammonds.

100. When the Property was subsequently conveyed from Smylie to Hammonds, Acquest had actual knowledge of FNBA's mortgage, but paid the proceeds of the sale of Unit 105 to Smylie instead of Hammonds.

101. FNBA Later foreclosed on the Smylie loan. The proceeds of the foreclosure sale were insufficient to satisfy the amount due and owing to FNBA.

102. As a direct result of the misrepresentations and concealments made by Orozco, FNBA has suffered a loss in excess of $75,000.00.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Acquest Title Services, LLC and Juan Orozco and for such other relief, as this Court deems just and equitable.

## COUNT VII
*Breach of Fiduciary Duty v. Acquest Title Services, LLC*

103. Plaintiff incorporates the allegations contained in Paragraphs 1-32 and 72-88 above as its allegations in Paragraph 103.

104.　　As settlement agent for the Smylie Loan, Acquest owed FNBA a fiduciary duty with regard to the Smylie Transaction.

105.　　Acquest breached its fiduciary duty to FNBA by, among other things,

　　A.　　Falsely certifying to FNBA that the Trustee's Deed and Smylie Mortgage were sent to the county for recording;

　　B.　　Concealing its breach by issuing false "First Lien Letters";

　　C.　　Failing to respond to FNBA's requests for information regarding the Smylie Mortgage; and

　　D.　　Failing to obey the settlement instructions.

106.　　As a result of Acquest's breach of its fiduciary duty, FNBA has suffered damages in excess of $75,000.00.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Acquest Title Services, LLC and for such other relief, as this Court deems just and equitable.

## COUNT VIII
*Unjust Enrichment v. Budimir Radojcic, Eugeniusz Dominikowski,*
*Acquest Title Services, LLC and Bell Capital, Inc.*

107.　　Plaintiff incorporates the allegations contained in Paragraphs 1-32 and 42-71 above as its allegations in Paragraph 107.

108.　　As a result of the misconduct as set forth above, Defendants were unjustly enriched as follows:

| | |
|---|---|
| Budimir Radojcic | $166,657.00 |
| Eugeniusz Dominikowski | $42,000.00 |
| Bell Capital, Inc. | $10,795.00 |
| Acquest Title Services, Inc. | $3,676.00 |

16

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Budimir Radojcic, Eugeniusz Dominikowski, Bell Capital, Inc., and Acquest Title Services, LLC and for such other relief, as this Court deems just and equitable.

## COUNT IX
*Breach of Contract v. Lawyers Title Insurance Corporation*

109.    Plaintiff incorporates the allegations contained in Paragraphs 1-11 and 72-106 above as its allegations in Paragraph 109.

110.    Lawyers Title issued FNBA a Closing Protection Letter, in which Lawyers Title agreed to reimburse FNBA for actual losses incurred by FNBA in connection with the Smylie Closing should Lawyers Title's agent, Acquest Title Services, LLC fail to perform certain of its duties or should Acquest commit certain acts of fraud or dishonesty.  A copy of the Closing Protection Letter is attached hereto as Exhibit C.

111.    Acquest failed to perform the Smylie Loan closing in accordance with the Settlement Instructions as previously set forth herein.

112.    In the alternative, Acquest committed fraud or dishonesty in the handling of FNBA's documents in connection with the Smylie Closing as previously set forth herein.

113.    FNBA made demand on Lawyers Title for reimbursement under the Closing Protection Letter.

114.    Lawyers Title has failed or refused to reimburse FNBA for its losses suffered in connection with Acquest's actions.

115.    As a result of Lawyers Title's breach, FNBA has suffered damages in excess of $75,000.00.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in its favor and against Lawyers Title Insurance Corporation and for such other relief, as this Court deems just and equitable.

                                      Respectfully Submitted,

                                      FIRST NATIONAL BANK OF ARIZONA

                                      s/ Craig C. Smith_____
                                      One of Its Attorneys

Craig C. Smith #6238126
Smith & Weik, LLC
10 S. LaSalle St., Suite 3702
Chicago, IL 60603
312-895-4560